**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **RICK BJORKLUND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 08-CV-424-TCK-PJC |
| | ) | |
| **(1) RANDI MILLER, individually and in** | ) | |
| **her official capacity as former Chairperson and** | ) | |
| **current Member of the Tulsa County Public** | ) | |
| **Facilities Authority;** | ) | |
| **(2) JOHN SMALIGO, Chairman of the** | ) | |
| **Tulsa County Public Facilities Authority;** | ) | |
| **(3) JAMES C. ORBISON, Vice-Chairman of** | ) | |
| **the Tulsa County Public Facilities Authority;** | ) | |
| **and** | ) | |
| **(4) FRED PERRY, Secretary of the Tulsa** | ) | |
| **County Public Facilities Authority;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court are Defendants' Motion for Summary Judgment (Doc. 78)[1] and Plaintiff's

Motion for Partial Summary Judgment (Doc. 77).

### I.    Factual Background

The Tulsa County Public Facilities Authority ("TCPFA") is a public trust organized and

existing under the laws of Oklahoma for the purpose of managing activities occurring on the Tulsa

County Fairgrounds ("Fairgrounds").   At all relevant times, the Trustees of the TCPFA were

Defendant Randi Miller ("Miller"); Defendant James Orbison ("Orbison"); Defendant Fred Perry

("Perry"); and Defendant John Smaligo ("Smaligo") (collectively "Defendants" or "Trustees").

---

[1]  Plaintiff's motion to strike Defendants' reply in support of their motion (Doc. 106) is
DENIED, as the reply brief is in compliance with the local rules.

On January 1, 2007, Plaintiff Rick Bjorklund ("Plaintiff") entered into an Employment Agreement ("Agreement") with TCPFA, whereby Plaintiff held the position of President and Chief Executive Officer of the Fairgrounds. The Agreement was executed by Plaintiff and Miller, as then-chairperson of the TCPFA. As part of his duties, Plaintiff managed the account of Big Splash Water Park ("Big Splash"), a business on the Fairgrounds that leased property from TCPFA. On October 15, 2006, Big Splash failed to make its lease payment. On or around January 2007, Plaintiff had a conversation with Big Splash's then-owner Jerry Murphy ("Murphy") regarding the payment. Plaintiff contacted Miller and told her that Big Splash's rent check would not clear the bank. Miller allegedly told Plaintiff "we need to just keep it off the radar." (Bjorklund Dep., Ex. B to Defs.' Mot. for Summ. J. 126:25-127:2.)[2] Plaintiff did not ask her what she meant, but he interpreted her statement to mean "don't let it be a spectacle." (*Id.* at 154:23-24.) Prior to his termination, Plaintiff took certain actions regarding the Big Splash account that he claims were pursuant to Miller's "off the radar" instruction. These actions included instructing TCPFA comptroller, Preston Jackson ("Jackson"), to keep the Big Splash account "off the radar." Jackson then removed the Big Splash account as an individual item in a report known as the "Summary Aging of Accounts Receivable" ("Report"). Plaintiff learned that Jackson removed the Big Splash account from the Report in May or June of 2007. On October 15, 2007, Big Splash again failed to make its annual rent payment.

On or around June 2008, Big Splash failed certain state inspections. On or around Thursday, June 26, 2008,[3] Plaintiff contacted Tom Hilborne ("Hilborne"), TCPFA's legal counsel. Plaintiff

[2] Miller denies ever making this statement to Plaintiff.

[3] Defendants' statement of fact 24 lists this date as June 26, 2007. This appears to be a typographical error.

2

told Hilborne "we're concerned that this – that the failure, Murphy's failure over Big Splash - Big Splash's failure of the inspections could trigger more questions or more issues" and asked Hilborne "what do you think we should do?" (*Id.* at 158:6-10.) The next morning, on Friday, June 27, 2008, Plaintiff contacted Smaligo, then-chairman of the TCPFA, and raised the same concerns. Around noon on the same day, June 27, 2008, Plaintiff, Jackson, Hilborne, and Smaligo met and discussed the Big Splash account.

The following day, on Saturday, June 28, 2008, a newspaper article was published in the *Tulsa World* entitled "Big Splash Late on 2007 Rent." Citing statements from Smaligo, the article reported that Big Splash had yet to pay its 2007 rent and that Big Splash's check for half of its 2006 rent went uncashed for a year. Plaintiff is quoted in this article as saying, "[w]e are obligated to proceed with conservative accounting principles, and in this case we should have required the rent earlier." (*See* Kevin Canfield, *Big Splash Late on Rent*, Tulsa World, June 28, 2008, *available at* tulsaworld.com.)[4]

On Monday, June 30, 2008, Hilborne instructed Teresa Clayton ("Clayton"), Plaintiff's assistant, to revise the upcoming TCPFA meeting agenda which was to be held July 1, 2008, to include the following agenda item:

> Vote to convene executive session to discuss the employment, hiring, appointment, promotion, demotion[,] disciplining or resignation of chief executive officer and/or comptroller pursuant to [state statute].

---

[4] The June 28, 2008 article is not part of the record, but the Court takes judicial notice of such article.

(Revised Meeting Agenda, Ex. P to Defs.' Mot. for Summ. J.)  This agenda ("Revised Agenda") was posted at 8:24 am on June 30, 2008, and Clayton gave a copy of the Revised Agenda to Plaintiff that morning.

During the July 1, 2008 TCPFA public meeting, TCPFA conducted a private, executive session discussing Plaintiff's and Jackson's employment.  After Trustees had met for approximately thirty minutes, Plaintiff was invited into the executive session.  Plaintiff's comments during the executive session, and the minutes allegedly summarizing the executive session, are disputed questions of fact.  Plaintiff admits, however, that the Big Splash issues were discussed with him during the executive session.  Plaintiff also admits that, although he was initially reluctant to name any names, he ultimately informed all Trustees during the executive session that any actions he took with regard to Big Splash were pursuant to Miller's "off the radar" instruction.   Following the executive session, Miller moved to terminate Plaintiff, and Plaintiff was terminated by unanimous vote of all four Trustees. Trustees did not make any public statements regarding the reasons for Plaintiff's termination at that time.

In a *Tulsa World* article published July 10, 2008 ("7/10/08 Article"), entitled "Ex-Expo Square Exec Says Commissioner Ordered Him to Ease Off Big Splash," Plaintiff first told the media about Miller's alleged "off the radar" statement.  It provides:

> Rick Bjorklund, who was fired as president and CEO of Expo Square, said Thursday that he was instructed by County Commissioner Randi Miller to keep Big Splash Water Park's financial troubles "off the radar."  The fair board last week voted 4-0 to terminate Bjorklund after it was discovered that a check for half of the water park's 2006 rent had gone uncashed for a year and that it had yet to pay its 2007 rent. In addition, Big Splash's outstanding 2007 balance was never listed specifically on the financial reports presented to the fair board.  Bjorklund said Miller, who was fair board chairwoman in 2007, spoke to him about the Big Splash situation in about June of that year.  *"The conversation (with Miller) was, 'Ease up on them and get it off the radar,'" he said.  Bjorklund said he told fair board members about Miller's*

*instructions during the executive session held to determine his fate. "I turned to Randi and I said: 'You had given me instructions, Randi, to get it off the radar screen, and we did that.'"* Miller on Thursday denied she ever told Bjorklund to cover up anything. *"That's a blatant lie,"* she said. *"I knew nothing about their rent not being paid, and I knew nothing about any bounced checks or financial problems that occurred."* *"Those decisions could never have been made without the full board's knowledge."* Miller said she and the other board members were opposed to assisting Big Splash the only time the park sought formal relief from the board in 2007. In a letter dated July 11, 2007, Big Splash asked the board to consider alleviating some of its financial responsibility, citing lost revenues caused by construction at the fairgrounds. "I said no, absolutely no way will it be subsidized, and Rick Bjorklund knew that," Miller said. The fair board is made up of the three county commissioners — John Smaligo, Fred Perry and Miller — and two appointees, Jim Orbison and Daryl Woodard. *Miller also challenged Bjorklund's assertion that he told board members she had instructed him to keep Big Splash's account off the radar. "He did not say that in executive session," she said.* Smaligo, who is the board's current chairman, declined to discuss what was said in the meeting. "The board has been advised by (its) attorney that the discussions in executive session are privileged, and that we should not discuss any of the conversations that occurred," he said.

. . .

Bjorklund said he was speaking publicly about his termination because the "impression was that I, or we, did something wrong. We did not — I followed the direction of the chairman." Attorney Gary Richardson, who is representing Bjorklund, said he has sent a letter to the Tulsa County Public Facilities Authority — also known as the fair board — seeking an explanation for Bjorklund's termination "so I will know how to advise him." Miller received a $5,000 campaign contribution from Loretta Murphy during her unsuccessful run for mayor in 2006. After Big Splash's troubles were revealed, Miller said she would try to somehow return the contribution, but also acknowledged that it had already been spent. As for Bjorklund, she said she could not understand what would prompt him to make such accusations. "Rick is just obviously upset over his termination, and he made some poor decisions we had to act on," she said.

(Ex. S to Defs.' Mot. for Summ. J. (emphasis added).)[5]

The following day, July 11, 2008, *Tulsa World* published a similar article entitled "Bjorklund

Says the Commissioner Wanted Big Splash 'Off the Radar,' But She Says That's A Lie." (*Id.*) On

---

[5] Exhibit S contains three *Tulsa World* articles, in chronological order from July 10, 2008 through July 12, 2008.

July 12, 2008, *Tulsa World* published a third article, entitled "Bjorklund Letter Asks for Reason," which reports that the TCPFA "has yet to explain how the [Big Splash] irregularities occurred and who ordered the Big Splash account to be handled in such a manner." (*Id.*) On July 15, 2008, *Tulsa World* published a fourth article entitled "Fair Board Details Reasons for Firing." This article reports that, according to a letter from TCPFA's counsel,[6] Plaintiff was terminated for "authorizing or causing the Big Splash account to be handled as it was without prior written authorization from the fair board," in violation of two specific provisions of Plaintiff's employment contract. (*See* Ex. S to Pl.'s Resp. to Defs.' Mot. for Summ. J.)

In his Complaint, Plaintiff asserted the following claims against all Defendants: (1) deprivation of a constitutionally protected property interest, in violation of 42 U.S.C. § 1983 ("§ 1983"); (2) deprivation of a constitutionally protected liberty interest, in violation of § 1983; and (3) breach of contract. Plaintiff asserted the following additional claims against Miller: (1) defamation; (2) injurious falsehood; and (3) intentional infliction of emotional distress ("IIED"). The case caption of the Complaint states that Miller is sued "individually and in her official capacity" but does not specify as to the other three Defendants. The parties and the Court have construed the Complaint as asserting claims against all Defendants in their individual and official capacities.

On September 3, 2009, the Court granted in part and denied in part Defendants' respective motions to dismiss. The Court held: "(1) Plaintiff's § 1983 claim for deprivation of a constitutionally protected property interest may proceed against all Defendants in their individual and official capacities; (2) Plaintiff's § 1983 claim for deprivation of a constitutionally protected

---

[6] This letter is not part of the summary judgment record.

6

liberty interest may proceed against Miller in her individual and official capacities but is dismissed as to Perry, Smaligo, and Orbison; (3) Plaintiff's defamation claim may proceed against Miller in her individual capacity only; (4) Plaintiff's injurious falsehood claim is dismissed; (5) Plaintiff's breach of contract claim is dismissed; and (6) Plaintiff's IIED claim may proceed against Miller in her individual capacity only." (9/23/09 Order at 22.) On March 2, 2011, Plaintiff dismissed his defamation claim against Miller with prejudice.

Thus, the remaining claims are: (1) Plaintiff's § 1983 claim for deprivation of a constitutionally protected property interest, asserted against all Defendants in their individual and official capacities; (2) Plaintiff's § 1983 claim for deprivation of a constitutionally protected liberty interest, asserted against Miller in her individual and official capacities; and (3) Plaintiff's IIED claim, asserted against Miller in her individual capacity. Defendants moved for summary judgment on all remaining claims, and Defendants raised a qualified immunity defense to all § 1983 claims asserted against them in their individual capacities. Plaintiff moved for partial summary adjudication on his § 1983 claim for deprivation of a constitutionally protected property interest.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## III.    Qualified Immunity Standard

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 749 (10th Cir. 1991) (internal quotation omitted). "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must clear two hurdles to defeat the defendant's motion." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010). The plaintiff must demonstrate, *on the facts alleged*, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity. *Id.* (emphasis added); *see also Calhoun v. Gaines*, 982 F.2d 1470, 1474 (10th Cir. 1992) (finding that district court erred by adopting the defendant's version of the facts in deciding the first prong of the qualified immunity analysis at the summary judgment stage). Thus, as in a typical summary judgment analysis, the Court does not resolve disputed facts in conducting the qualified immunity analysis and instead must construe the facts in favor of Plaintiff.

## IV.    § 1983 Property Interest Claim

The Fourteenth Amendment protects citizens from the deprivation of "life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision . . . ." *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d

483, 490 (10th Cir. 1991). "To determine whether a plaintiff was denied procedural due process, [a court] engage[s] in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998).

## A.      Protected Property Interest

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Hulen v. Yates*, 322 F.3d 1229, 1240 (10th Cir. 2003). "Thus, constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials." *Id.* In the employment context, "when a person's employment can be terminated only for specified reasons, his or her expectation of continued employment is sufficient to invoke the protections of the Fourteenth Amendment." *West v. Grand Cty.*, 967 F.2d 362, 366 (10th Cir. 1992).

Section 3 of the Agreement, entitled "Term of Employment," provides that the term of the Agreement shall be a period of five years "subject, however, to prior termination as provided" in the Agreement. (Def.'s Mot. for Summ. J., Ex. G.)[7] Section 13 of the Agreement, entitled "Termination," provides that TCPFA "shall have the right to terminate this Agreement at any time, *without notice*, in the event of the occurrence of any of the following:" (1) conviction; (2) violation of the Agreement or injuring the business or goodwill of the employer; (3) engaging in competition

---

[7] It also provides that, upon expiration of the third year, the Agreement shall be automatically renewed for additional periods of one calendar year, provided neither party provides written notice of termination not less than sixty days prior to the end of the current calendar year. Plaintiff's termination occurred during the second year of the Agreement.

with the employer; (4) employee's disability; (5) employee's death; or (6) discontinuation of employer's business.  (*Id.* (emphasis added).)

Defendants contend that the "without notice" language in the termination provision "eliminates any requirement that the TCPFA give [Plaintiff] an opportunity to contest the TCPFA's decision regarding termination of the [Agreement]."  (Def.'s Mot. for Summ. J. 13 (arguing that the "unique terms of the [Agreement] place it outside of the typical tenure agreement or similar employment contract giving rise to a protected property interest in continued employment, and is more akin to an at-will employment contract").)

Defendants did not cite any federal authority holding that "without notice" or other similar language in what otherwise amounts to a "for cause" employment contract eliminates the employee's property right in his employment.  Nor did the Court locate same.[8]  Relevant Tenth Circuit authority provides that due process protections attach "when a person's employment can be terminated only for specified reasons."  *See West*, 967 F.2d at 366.  The "without notice" language in the Agreement is, in the Court's view, insufficient to overcome procedural due process rights that would otherwise attach to this type of employment agreement.  Plaintiff had a protected property interest in his public employment as a matter of law, and Plaintiff is entitled to summary adjudication on this issue.

---

[8]  The only case cited by Defendants is an Oklahoma Supreme Court decision holding that "[f]ailure to abide by the provisions of the lease agreement gives rise to a cause of action for breach of that agreement, not to a cause of action for deprivation of property rights."  *Robert K. Bell Enterpr., Inc. v. Tulsa Cnty. Fairgrounds Trust Auth.*, 695 P.2d 513, 518 (Okla. 1985). However, such case did not involve an employment agreement, and the Court finds it of little relevance in deciding the issue presented.

## B. Appropriate Level of Process

When a public employee has a constitutionally protected property interest in his employment, deprivation of this property interest must be "preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotations omitted). The Tenth Circuit has further indicated that "[a] fundamental principle of procedural due process is a hearing before an impartial tribunal." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998). All three requirements – notice, opportunity for hearing, and an impartial tribunal – must be satisfied in order for due process to attach.

### 1. Notice

Construing the facts favorably to Plaintiff, the Court concludes that Plaintiff had sufficient notice that his job was in jeopardy and would be discussed at the July 1, 2008 meeting. The Revised Agenda, at item 18, provides: "Vote to convene executive session to discuss the employment, hiring, appointment, promotion, demotion[,] disciplining or resignation of chief executive officer and/or comptroller pursuant to [state statute]." The Revised Agenda was posted at 8:24 a.m. on Monday, June 30, 2008, one full day prior to the July 1, 2008 meeting at which Plaintiff was terminated. It is not disputed that Plaintiff received the Revised Agenda on the morning of June 30, 2008. The Court rejects Plaintiff's argument that the Revised Agenda's language is too broad to put a reasonable employee on notice that adverse job consequences, up to and including termination, were a potential outcome of the meeting. Instead, the Revised Agenda – which included the words "employment," "resignation," "demotion," and "discipline" as topics of discussion – was sufficient to warn Plaintiff that termination and/or demanding his resignation were possible outcomes of the meeting. *Cf. Calhoun v. Gaines*, 982 F.2d 1470, 1476 (relied upon by Plaintiff) (reasoning that the

plaintiff did not have sufficient notice that "his employment [was] in jeopardy of termination" where the plaintiff could have reasonably inferred that meeting was for the sole purpose of discussing contract modifications and performance objectives, "rather than a proceeding to discuss the appropriateness of a termination decision").

Second, the Court rejects Plaintiff's argument that twenty-four hours was an insufficient notice period. The Tenth Circuit has indicated that there is no set length of time that must be provided and that termination immediately following notice may be sufficient. *See West*, 967 F.2d at 368 (holding that employee had sufficient notice because she "knew in advance of her termination that the county attorney proposed to eliminate her job"); *Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989) (holding that "oral notice" of charges during a face-to-face conversation with supervisor, where employee was fired during same conversation, was sufficient notice).

Finally, Plaintiff's own deposition testimony reveals that he was aware of the specific allegations against him and reasons that his employment was in jeopardy – namely, his handling of the Big Splash account. Plaintiff testified that: (1) Plaintiff informed Hilborne of issues involving the Big Splash account on June 26, 2008, (2) Plaintiff informed Smaligo of issues involving the Big Splash account on the morning of June 27, 2008; (3) Plaintiff had a meeting with Smaligo and Hilborne regarding the Big Splash issues on June 27, 2008; (4) during this meeting, Hilborne accused Plaintiff of intentionally lying to the board, and Smaligo indicated that he had serious concerns with the Big Splash issues; (4) following the meeting, Hilborne directed Clayton to revise the agenda to include discussion of Plaintiff's and Preston's employment status; (5) Plaintiff was aware of Hilborne's instruction to Clayton to revise the agenda to include review of Plaintiff's employment; (6) Plaintiff assumed that the discussion regarding his employment was going to

revole around the Big Splash account; (7) Plaintiff called board members and an attorney in advance of the meeting; and (8) Plaintiff spoke to an attorney for five to ten minutes before he met with the board during the executive session. (*See* Bjorklund Dep., Ex. B to Defs.' Mot. for Summ. J., at 156:22-170:18; 187:17-24.) Under these undisputed circumstances, the Court concludes that Plaintiff had sufficient notice of his potential termination and the reasons for his potential termination.

### 2. Opportunity for Hearing Appropriate to the Case

A pre-termination hearing is required because "some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision." *Loudermill*, 470 U.S. at 543. However, the Supreme Court has also stated that "the pretermination 'hearing,' though necessary, need not be elaborate." *Id.* at 545. "[T]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.* (internal quotations omitted). Although "'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action," the Supreme Court has indicated that "[t]he essential requirements of due process . . . are notice and an opportunity to respond" and "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken." *Id.* at 546. "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* at 546. Applying the *Loudermill* standard, the Tenth Circuit has "upheld as sufficient to meet these requirements informal proceedings, such as pretermination warnings and an opportunity for a face-to-face meeting with supervisors," and "even a limited conversation between

an employee and his supervisor immediately prior to the employee's termination." *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009).

The Court concludes that, even construing the facts favorably to Plaintiff, Plaintiff had a meaningful opportunity to be heard during the executive session of the July 1, 2008 meeting. The actual content of the executive session and the accuracy of the minutes summarizing the executive session are factually disputed. However, Plaintiff's deposition testimony provides the Court's basis for summary adjudication on the issue of whether he had a meaningful opportunity to be heard. Plaintiff admits that he was called into the executive session and that he was asked about his handling of the Big Splash account. According to Plaintiff, he initially resisted "naming names" and avoided directly answering Orbison's question of whether anyone in the room knew that the Big Splash check had not been deposited. However, Plaintiff ultimately explained his side of the story and defended his actions regarding the Big Splash account. Specifically, he claims to have informed Trustees that his challenged conduct was directed by Miller. Plaintiff testified that he confronted Miller directly and said, "'Randi, it was you and you know it. You told me to get it off the radar.'" (Bjorklund Dep., Ex. B to Defs.' Mot. for Summ. J., at 191:14-21.) Plaintiff was also asked what he believed an appropriate punishment would be for his actions. Therefore, during the executive session, Plaintiff had incentive and opportunity to explain his handling of the Big Splash account, and he did so. At the time of their termination decision, Trustees were aware of Plaintiff's version of events and his asserted justification for the challenged actions. Thus, as in Tenth Circuit decisions rejecting similar procedural due process claims, Plaintiff "was not fired out of the blue," "was not fired for reasons that he did not know," and "was not fired without being given the opportunity to present his side of the story." *See West*, 967 F.2d at 368 (citing *Siebert v. Univ. of*

*Okla. Health Sci. Ctr.*, 867 F.2d 591, 599 (10th Cir.1989)); *see also Loudermill*, 470 U.S. at 543 & n.8 (explaining that central concern is employee's ability to "present his side of the case" so that employer is "alerted to the existence of disputes about facts and arguments about cause and effect").

Plaintiff contends that, in addition to being afforded an opportunity to present his justification for his actions, he should have been afforded the right to present and cross-examine witnesses. He argues that, since he did not have the opportunity for post-termination process, he should have been afforded full-blown trial rights in the pre-termination process. *See Tonkovich*, 159 F.3d at 517-18 (explaining that pre-termination process must be examined in light of post-termination process). However, the Court finds that, even without a post-termination proceeding, Plaintiff received more than adequate process in this case. Plaintiff admitted then and admits now that he engaged in the relevant conduct regarding the Big Splash account. He merely contended that his actions were implicitly authorized by Miller's "off the radar" comments, and the Trustees were aware of this alleged authorization. During the executive session, Trustees heard from Plaintiff and Miller, the only two people privy to the alleged conversation during which Miller instructed Plaintiff to keep it "off the radar." Under these circumstances, Plaintiff was not denied adequate procedural due process based on his inability to present and cross-examine witnesses. *Cf. McClure v. Ind. Sch. Dist. No. 16, Mayes Cnty., Okla.*, 228 F.3d 1205, 1211 (10th Cir. 2000) (holding that plaintiff did not receive adequate process during post-termination hearing because she was not given opportunity to cross-examine witnesses accusing her of drinking on the job and coming to school inebriated) (explaining that presentation and cross-examination of witnesses is generally not required where the plaintiff admits factual allegations against him).

### 3.      Impartial Tribunal

As set forth above, "[a] fundamental principle of procedural due process is a hearing before an impartial tribunal." *Tonkovich*, 159 F.3d at 518. A tribunal is impartial when "the risk of unfairness is intolerably high" under the circumstances of a particular case. *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986). A plaintiff "claiming bias on the part of an administrative tribunal must overcome a presumption of honesty and integrity in those serving as adjudicators." *Hicks*, 942 F.2d at 746. One biased member of a tribunal is sufficient to taint the entire panel and deprive a plaintiff of procedural due process. *Id.* at 748 (finding that "if [potentially biased member] is found to have been biased when she cast her vote on [the plaintiff's] dismissal, her presence will have tainted the tribunal and violated [the plaintiff's] due process rights") (reasoning that there is no way to know the extent of influence of the biased member).

"[V]arious situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). One such situation is where an adjudicator "has been a target of personal abuse or criticism from the party before him." *Id.* (citing cases). Another situation is where a member of the tribunal has "'the kind of personal or financial stake in the decision that might create a conflict of interest.'" *Hicks*, 942 F.2d at 747 (quoting *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 492-93 (1976)). A third situation is where a member of the tribunal is "biased with respect to the factual issues to be decided at the hearing." *Tonkovich*, 159 F.3d at 518. In contrast to these situations, "'[m]ere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not . . . disqualify a decisionmaker.'" *Hicks*, 942 F.2d at 747 (quoting *Hortonville*, 426 U.S. at 492-93). "'Nor is a

decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Id.* (quoting *Hortonville*, 426 U.S. at 492-93).

Considering the record presented on Plaintiff's motion for summary adjudication on this claim,[9] a reasonable jury could conclude that one member of the tribunal, Miller, was impartial because she: (1) was the subject of a personal attack by Plaintiff during the executive session – namely, that Miller authorized Plaintiff to keep Big Splash's payment failures "off the radar" and then failed to inform her fellow board members of this statement; (2) had a personal stake in the outcome of Plaintiff's termination proceeding and a conflict of interest – namely, to clear herself of any potentially untoward conduct by shifting blame entirely to Plaintiff; and (3) was biased as to relevant facts that were discussed during the executive session – namely, whether Plaintiff's actions were implicitly authorized by Miller. These accusations against Miller were inextricably intertwined with Plaintiff's termination proceeding. Construing the record in a light most favorable to Plaintiff, a jury could conclude that Miller was not capable of judging this particular controversy fairly on the basis of its own circumstances. *See Hicks*, 942 F.2d at 747.

Although he has created a genuine question for trial, Plaintiff has failed to demonstrate that he is entitled to judgment as a matter of law. Instead, disputed questions of fact inform this issue and whether Miller should have refrained from voting on Plaintiff's termination. For example, the disputed issue of what actually occurred during the executive session will inform the nature and

---

[9] Defendants failed to address this due process requirement in its own motion for summary judgment, despite that the Court noted such requirement in its 9/3/09 Order.

degree of Miller's potential bias against Plaintiff. Therefore, Plaintiff has failed to prove as a matter of law that he was denied his right to an impartial tribunal, and he is not entitled to summary adjudication on this claim.

### C.    Qualified Immunity

The Court has found that a reasonable jury could conclude that Plaintiff was not afforded adequate pre-termination process based on Miller's tainting of the four-person tribunal that terminated Plaintiff. Thus, Plaintiff has cleared the first hurdle of the qualified immunity analysis. The next question is whether any Defendants are entitled to qualified immunity because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Hicks*, 942 F.2d at 749.

The Tenth Circuit's decision in *Hicks* is directly on point. In *Hicks*, the court addressed whether non-biased tribunal members who participated in a termination vote with an arguably biased tribunal member were entitled to qualified immunity. The court phrased the issue and held as follows:

> Was the law clearly established that, because one council member was arguably biased, the remainder of the council members, though qualified, must refrain from participating or face civil damages? The answer to that question is clearly no. In fact, the cases suggest that the established law is to the contrary. In cases in which some but not all members of an administrative tribunal were biased, the courts hold that the tribunal may reconvene without the biased members and vote anew. Thus, it is the participation of the biased members, not the unbiased, which constitutes the constitutional wrong. A contrary holding would place on all administrative tribunal members a duty to ferret out possible bias among their colleagues, or to face civil damages regardless of their own fairness and integrity. Such a rule would disrupt the functioning of administrative tribunals. Our holding properly places on each tribunal member the duty to disqualify herself if she is biased in fact.

*Id.* at 750 (citations omitted).

In this case, as in *Hicks*, there is no evidence that Smaligo, Perry, or Orbison were themselves biased. Therefore, they were "constitutionally qualified to participate in and vote on the decision regarding" Plaintiff's termination. *Id.* The law was not clearly established that they had a duty to refrain from voting on Plaintiff's termination or face civil damages. In fact, based on *Hicks*, Tenth Circuit law is directly to the contrary. *See id.* In contrast, with respect to Miller, the *Hicks* decision constitutes clearly established Tenth Circuit law that biased members of a tribunal must refrain from participating in the termination decision or face the risk of civil damages. *See id.*

Therefore, the Court holds that Defendants Smaligo, Perry, and Orbison are entitled to qualified immunity as a matter of law. Defendant Miller is not entitled to qualified immunity as a matter of law.

### D.     Monetary Damages

Defendants have also moved for summary adjudication on the issue of whether Plaintiff may recover monetary damages resulting from the alleged denial of process. "Generally, damages for procedural due process violations may include damages arising out of the termination of employment if there is a causal connection between the termination and the failure to provide a hearing." *Montgomery v. City of Ardmore*, 365 F.3d 926, 937 (10th Cir. 2004) (internal quotation omitted). "However, if the employer can establish that the employee would have been terminated even if a proper hearing had been given, the terminated employee cannot receive damages stemming from the termination in an action for a procedural due process violation." *Id.* (internal quotation omitted). The defendant must establish, by a preponderance of the evidence, that it would have reached the same termination decision in any event. *See id.* "Unless the defendant carries that

burden, the plaintiff is entitled to recover damages for the injury caused by the defendant's adverse action." *Id.*

Defendants have presented affidavits from each Defendant stating that: (1) TCPFA, as a board, never authorized Plaintiff to alter Big Splash's payment schedule or hold rent checks from Big Splash; and (2) "[r]egardless of whether additional hearings had been held prior to or subsequent to the meeting on July 1, 2008, based on [Plaintiff's] admitted actions in connection with the Big Splash account, [he or she] would have voted to terminate Plaintiff's employment." (Exs. T-W to Defs.' Mot. for Summ. J.)

Defendants have shown, based on their undisputed affidavits, that they are entitled to summary adjudication on this defense. Plaintiff attempts to create a question of fact by citing certain deposition testimony of Perry. This testimony indicates that (1) prior to the meeting, Perry did not believe Plaintiff should be terminated, and (2) during the meeting but outside the presence of Plaintiff, Smaligo raised certain issues and conduct in addition to that which Plaintiff admitted. Plaintiff contends that such issues played a role in Perry's change in decision, and had Plaintiff been able to refute these statements by Smaligo, he may not have been terminated. However, Perry's deposition testimony does not create a question of fact. Instead, it is consistent with his affidavit that he would have terminated Plaintiff based on Plaintiff's *admitted* conduct, regardless of whether Plaintiff had been afforded the opportunity to present evidence on other issues. (*See* Perry Dep., Ex. K to Pl's Resp. to Def.'s Mot. for Summ. J., at 94 (explaining that he did not believe, prior to the July 1, 2008 meeting, that Plaintiff would be terminated but that, prior to the meeting, he "didn't know about two others – about two major factors: the 2007 payments and the financial statement"). In light of the affidavits and the admitted actions taken by Plaintiff without approval of the TCPFA

20

as a whole, the Court finds no genuine question of fact as to whether (1) Miller's recusal, or (2) any

further evidentiary hearings would have prevented Plaintiff's termination. The undisputed evidence

demonstrates that he would been terminated anyway. *See Cifarelli v. Village of Babylon*, 894

F.Supp. 614, 622 (E.D.N.Y.,1995) (finding as a matter of law that "a pre-termination hearing would

not have staved off" the plaintiff's termination) (holding, therefore, that "although defendants'

failure to provide plaintiff with sufficient notice of termination and a pre-termination hearing

violated his right to procedural due process, defendants' motion for summary judgment should be

granted insofar as it seeks to bar plaintiff from recovering more than a nominal amount).

## V.     § 1983 Liberty Interest Claim

In his second cause of action, Plaintiff alleges deprivation of a liberty interest protected by

the Fourteenth Amendment – namely, the right to a name clearing hearing following stigmatizing

statements made by a public official acting under color of law. At earlier stages of the proceedings,

this claim was based upon (1) statements regarding Plaintiff's mishandling of the Big Splash account

("Funds Statements"), and (2) Miller's statements to the *Tulsa World* regarding Plaintiff lying to the

media about the circumstances surrounding his handling of the Big Splash account ("Liar

Statements").[10] By omitting any arguments regarding the Funds Statements, Plaintiff's response to

Miller's motion for summary judgment indicates that this claim is now limited to the Liar Statements

made by Miller to *Tulsa World* on or around July 10, 2008. Therefore, the Court's analysis is

limited to the Liar Statements.

---

[10] Construing the articles in a light favorable to Plaintiff, Miller accused Plaintiff of lying to the media regarding at least two subjects: (1) Miller giving Plaintiff the "off the radar" instruction; and (2) Plaintiff reporting this to Trustees during the executive session leading to his termination. Thus, the Court refers to "Liar Statements" in the plural.

In the context of public employment, the Supreme Court has held that a constitutionally protected liberty interest may arise when a person's "good name, reputation, honor, or integrity" is at stake. *See Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 573 (1972). Interpreting *Roth* and its progeny, the Tenth Circuit stated:

> Putting these cases together, we can construct the parameters of a liberty interest case involving the discharge of a public employee. When a public employee takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities, a claim for relief is created.

*Melton v. City of Okla. City*, 928 F.2d 920, 927 (10th Cir. 1991). Subsequent Tenth Circuit cases have interpreted *Melton* to create a four-part test ("*Workman* test"):

> In order to demonstrate the infringement of a liberty interest in one's good name, one must show that: (1) the defendant made a statement impugning his or her good name, reputation, honor, or integrity; (2) the statement was false; (3) the defendant made the statement in the course of termination proceedings [and] the statement foreclosed future employment opportunities; and (4) the statement was published.

*Tonkovich*, 159 F.3d at 526 (emphasis added); *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994); *Renaud v. Wyo. Dep't of Human Servs.*, 203 F.3d 723, 728 n.1 (10th Cir. 2000) (modifying third element of *Workman* test by removing disjunctive "or" from third element and clarifying that statement must have been made in the course of termination proceedings in all cases). In addition to these specific requirements, Plaintiff must also satisfy the jurisdictional requirement present in every § 1983 action that the "claimed deprivation was committed by a person acting under color of state law." *Haines v. Fisher*, 82 F.3d 1503, 1508 (10th Cir. 1996); *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) ("The under color of state law requirement is a jurisdictional requisite for a § 1983 action.") (internal quotations omitted).

If a plaintiff can establish these elements, a defendant has infringed a plaintiff's procedural due process rights if it failed to provide a "name-clearing hearing." *See Roth*, 408 U.S. at 573 n.12 (stating that, where a liberty interest is implicated, due process requires notice and a hearing to "provide the person an opportunity to clear his name"); *Tonkovich*, 159 F.3d at 526 (holding that no constitutional violation may occur if a procedurally proper name-clearing hearing is provided).[11]

Miller makes three arguments related to Plaintiff's inability to establish any unconstitutional deprivation of his liberty interests: (1) Plaintiff failed to request a name clearing hearing, which is a prerequisite to suit; (2) Plaintiff cannot show that the Liar Statements were made in the course of termination proceedings; (3) Plaintiff cannot show that the Liar Statements were made by Miller under color of law. If any of these arguments succeed, Miller is entitled to summary judgment as to all claims asserted against her in an individual and official capacity because there can be no underlying constitutional violation.

### A.      Failure to Request Name Clearing Hearing

Under Tenth Circuit law, a request for a name clearing hearing is not a jurisdictional prerequisite to suit. *See Eames v. City of Logan, Utah*, 762 F.2d 83, 85 (10th Cir. 1985) (district court dismissed claim "because plaintiff had not requested a hearing, [and] no deprivation had yet occurred") (reversing and explaining that the plaintiff's "failure to earlier request a name-clearing

_____

[11]   The purpose of a name clearing hearing is not to determine whether the charges were an adequate reason for termination or whether a plaintiff should be reinstated to his position. Instead, the purpose of the hearing is to allow a plaintiff to clear his name and show that the accusations were false. *See DeFries v. Town of Wash., Okla.*, 875 F. Supp. 756, 765 (W.D. Okla. 1995).

hearing does not defeat his claim" and that "[plaintiff] may still be entitled to a hearing if he can prove at trial that his liberty interest was indeed violated").[12]

Miller argues that a subsequent Tenth Circuit decision, *Sandoval v. City of Boulder, Colorado*, 388 F.3d 1312, 1328-29 (10th Cir. 2004), overrules *Eames*. However, *Sandoval* does not provide sufficient grounds for this Court to ignore the holding in *Eames*. First, the court in *Sandoval* did not expressly overrule or mention *Eames*. Second, the *Sandoval* quotation cited by Miller – that the plaintiff "waived any argument that she was denied due process by failing to request the hearing to which she now claims she was entitled" – occurred in the court's discussion of whether the plaintiff waived her right to a due process proceeding. Such discussion preceded the court's discussion of whether the plaintiff was entitled to a name clearing hearing, which did not include any mention of whether a request for a name clearing hearing was a prerequisite to suit.[13] Third, the case cited in *Sandoval* following the relevant quotation, *Pitts v. Board of Education of U.S.D. 305, Salina, Kansas*, 869 F.2d 555 (10th Cir. 1989), was limited to the issue of procedural due process and did not address a deprivation of liberty interest. *See id.* at 557 ("By waiving his hearing, Pitts deprived the school board of the opportunity to provide him with due process, and he gave up his right to test the correctness of the board's decision."). Thus, the Court is bound to follow *Eames*.[14]

---

[12] In his prayer for relief, Plaintiff does not specifically request a name clearing hearing following trial as equitable relief but does request any relief the Court deems just.

[13] In *Sandoval*, the plaintiff had, subsequent to filing litigation, requested a name clearing hearing. However, this does not seem to have been relevant to the court's analysis. In addition, even under law explained *supra* note 9 holding that a request for a name clearing hearing is a jurisdictional prerequisite, the request must be made pre-suit.

[14] *Eames* is contrary to more recent law in other circuits. *See, e.g., Quinn v. Shirey*, 293 F.3d 315, 323 (6th Cir. 2002) (plaintiff's failure to request a name clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process); *Winkoski v. City of Stephen*, 442 F.3d 1107, 1112 (8th Cir. 2006) (same); *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006) (same).

24

**B.     Course of Termination Proceedings**

"[A] court must examine both the nature and the timing of an allegedly defamatory statement to determine whether it has been made in the course of an employee's termination." *Renaud*, 203 F.3d at 727. Although "[t]iming is certainly one consideration in determining whether stigmatizing statements are made in the course of the termination of employment," the defamatory statements "need not be strictly contemporaneous with a termination to occur in the course of the termination of employment." *Id.* Instead, the Tenth Circuit endorses a "common-sense" approach whereby a court considers both the nature of the alleged defamation and when the statement was made in relation to the termination. *Id.* Statements regarding matters other than the reasons for termination, even if they occur roughly contemporaneously to the termination, are not relevant. *Id.* "What is relevant to [the] analysis is the manner in which a public employee is terminated, and statements made incident to the termination." *Id.* (internal quotations and citation omitted).

Miller argues that the Liar Statements do not satisfy the third *Workman* prong because they "did not concern the reasons for [Plaintiff's] discharge and [were] made more than a week after [Plaintiff's] discharge, in response to allegations leveled against Miller." (Defs.' Mot. for Summ. J. 21.) However, Defendants' argument ignores the reality of the publicity surrounding Plaintiff's termination from June 28, 2008 to July 11, 2008 and the potential stigma attaching thereto. Under the common-sense approach endorsed by the Tenth Circuit, and construing the facts in a light most favorable to Plaintiff, a jury could conclude that Miller's statements involved the reasons for Plaintiff's termination and were made incident thereto. There is evidence that Plaintiff's accusations against Miller were discussed during the executive session, necessarily injecting such accusations

into the termination process. Plaintiff was terminated shortly after the controversial circumstances regarding the Big Splash account were first made public by Smaligo in the 6/28/08 Article. According to Plaintiff, he told Trustees during the executive session about Miller's instructions, and they terminated him anyway. Plaintiff then allegedly attempted to eradicate the public perception of his wrongdoing by informing the media that his actions regarding the Big Splash account were pursuant to Miller's instructions. Miller then accused Plaintiff of lying, indicating that she did not direct him to keep the Big Splash account off the radar and that any actions he took were of his own accord. Miller also accused Plaintiff of lying about what he told Trustees during the executive session. These facts are sufficient to preclude a grant of summary judgment based on the third *Workman* element. *Cf. Renaud*, 203 F.3d at 727-28 (affirming grant of summary judgment because alleged defamation regarding a plaintiff being dangerous and potentially suicidal "had nothing to do with the reasons for termination," which were abusing alcohol on the job, and also had no "bearing on the manner of termination," which occurred privately by certified letter).

### C.    Under Color of State Law

"To state a claim under § 1983, a plaintiff must allege that the claimed deprivation was committed by a person acting under color of state law." *Haines v. Fisher*, 82 F.3d 1503, 1508 (10th Cir. 1996). "The under color of state law requirement is a jurisdictional requisite for a § 1983 action." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (internal quotations omitted). While acknowledging that distinguishing between purely private conduct and governmental conduct can be a difficult task, the Tenth Circuit outlined "some parameters from existing law." *See id.* In the public employment context, "state employment is generally sufficient to render the defendant a state actor." *Id.* at 493 (internal quotation omitted). "[M]any tortious acts committed by state employees will occur in the performance of the employee's official duties," and such actions are taken under

color of law regardless of whether the state employee oversteps his line of authority. *Id.* However, this "general rule" does not apply to purely private acts that are not "committed on account of the authority vested in the employee by the state." *Id.* Applying these principles, the Tenth Circuit stated that "it is the plaintiff's burden to plead, and ultimately establish, the existence of 'a real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate action was taken 'under color of state law.'" *Id.* at 494.

Defendants are not entitled to summary judgment based on Plaintiff's inability to show that Miller was acting under color of state law at the time she made the Liar Statements. In the 7/10/08 Article, in which Miller first stated that Plaintiff had told the newspaper a "blatant lie," Miller was identified as "County Commissioner," a current member of "the board," and the "fair board chairwoman in 2007." All of Miller's comments are directly related to her official role and duties as a TCPFA Trustee. But for Miller's position of county authority, she would have had no occasion to be interviewed or to make the allegedly stigmatizing comments about Plaintiff. The public battle in this case was between Plaintiff as a former public employee and Miller as a public official, rather than some type of personal, private disagreement that was divorced from Miller's official duties. Therefore, Plaintiff's evidence could show a real nexus between Miller's statements and her badge of governmental authority, and Defendant is not entitled to summary judgment.

**D.      Official Capacity Claim**

For the reasons explained in Parts V.A-C, a reasonable jury could conclude that Miller's statements to the press constituted a violation of Plaintiff's constitutional rights. With respect to the official capacity claim, the Court must also determine whether TCPFA may be held liable for Miller's statements.

Miller correctly argues that any claim against her in her official capacity is essentially a claim against TCPFA. *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) ("An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works."). TCPFA cannot be liable for any constitutional deprivation caused by Miller's statements to the press based simply on a theory of *respondeat superior*. Instead, municipal liability under § 1983 "attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). The Tenth Circuit has stated that "[a] plaintiff may prove the existence of an official policy or custom in at least five ways: (1) the municipality may be liable for a decision by its properly constituted legislative body; (2) an official policy exists when the municipal board or agency exercises authority delegated to it by a municipal legislative body; (3) actions by those with final decision-making authority for the municipality constitute official policy; (4) the municipality may be liable for a constitutional violation resulting from inadequate training when its failure to train the lawless employee reflects a deliberate indifference to the plaintiff's constitutionally-protected rights; or (5) the municipality's custom caused the constitutional violation. *Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1256-57 (10th Cir. 2007). Whether municipal liability may attach is a question of law for the Court. *See Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003).

TCPFA did not have any formal policy or informal custom of issuing false, potentially stigmatizing public statements in connection with terminations. To the contrary, TCPFA met in private executive session to discuss Plaintiff's termination and did not make any public statements at the time of Plaintiff's termination. Further, all TCPFA members except Miller declined comment

to the *Tulsa World*.  This also indicates that TCPFA adequately trained its members to refrain from making such statements.  Thus, Plaintiff cannot establish municipal liability based on methods 1, 2, 4, or 5 identified above.

The issue here is whether Plaintiff can establish municipal liability because Miller's actions could be deemed an "action[] by [a person] with final decision-making authority for the municipality."  *See Darr*, 495 F.3d at 1257 (third method).  Under Tenth Circuit law, "[t]hree factors help us decide whether an individual is legally a final policymaker for a municipality: (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final- *i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Brammer-Hoelter*, 602 F.3d at 1189-90 (finding that certain directives issued by administrator did not constitute a formal academy policy because her decisions were legally constrained by board policies and board was final policy maker on school matters).  Here, even assuming Miller's statements to the press could be deemed some type of "policy decision," Miller was not within the realm of her official grant of authority at the time she made such statements.  As explained above, there were no official comments made at the time of termination, and all other board members declined commenting on Plaintiff's terminations.  Miller was in no way authorized by the other members of TCPFA to make the Liar Statements, nor were such statements made pursuant to any "deliberate choice" by TCPFA as a whole.  Accordingly, municipal liability may not attach to Miller's actions.

### E.    Individual Capacity Claim

For the reasons explained in Parts V.A-C, a reasonable jury could conclude that Miller's statements to the press constituted a violation of Plaintiff's constitutional rights. Thus, Plaintiff has satisfied his first summary judgment hurdle for qualified immunity. Miller may still be entitled to qualified immunity at this stage of the proceedings, however, if Plaintiff's alleged right was not "clearly established at the time official action was taken." *See Walker v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2007) (holding that Plaintiff's complaint stated a claim for a constitutional deprivation but that the contours of the right at issue were not clearly established and that official was therefore entitled to qualified immunity).

Miller's arguments in support of qualified immunity focused exclusively on the first prong – the absence of any constitutional deprivation. In any event, there exists ample Tenth Circuit authority that a public employee has a claim for relief when "a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty . . . that might seriously damage the employee's standing . . . and foreclose the employee's freedom to take advantage of future employment opportunities." *See, e.g., Darr*, 495 F.3d at 1255. Construing the facts in a light most favorable to Plaintiff – that Miller falsely accused Plaintiff of lying about the asserted justification for actions leading to his termination – the Court concludes that a reasonable official in Miller's position would have known that her statements to the press, approximately one week following Plaintiff's termination, were sufficiently stigmatizing to warrant a name clearing hearing. Thus, Miller is not entitled to summary judgment based on her qualified immunity defense.

## VI.    IIED

"To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Publ'ns v. Welton*, 49 P.3d 732, 735 (Okla. 2002). "The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of the plaintiff's distress." *Id.* The roles of the court and jury are defined as follows:

> The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether it is necessarily so. Where, under the facts before the court, reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability. Likewise, it is for the court to determine, in the first instance, whether based upon the evidence presented, severe emotional distress can be found. It is for the jury to determine whether, on the evidence, severe emotional distress in fact existed.

*Breeden v. League Services Corp.*, 575 P.2d 1374, 1377-78 (Okla. 1978) (footnotes omitted). "The trial court's gatekeeper role with regard to the second and fourth elements of the tort of intentional infliction of emotional distress ensures that only valid claims reach the jury under the appropriate legal standards." *Welton*, 49 P.3d at 735. "Liability for the tort has only been found where the offending conduct has so totally and completely exceeded the bounds of acceptable social interaction that the law must provide redress." *Warren v. United States Specialty Sports Ass'n*, 138 P.3d 580, 585 (Okla. Civ. App. 2006) (internal quotations omitted). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"; instead, the tort of IIED requires an "[e]xtraordinary transgression of the bounds of civility." *Id.* (internal quotations omitted).

The worst-case scenario contemplated in the Court's previous order denying Miller's motion to dismiss – a scheme whereby Miller specifically directed Plaintiff to take certain actions, called for his termination, and then falsely called him a liar in the media – was not supported by the evidence. The worst conduct at issue consists of Miller's public denial that she implicitly instructed Plaintiff to keep the Big Splash account off the radar. There is no evidence that Miller specifically directed Plaintiff to take any of the actions for which he was terminated. While the facts could potentially give rise to a constitutional deprivation of Plaintiff's liberty interest in his reputation, they are not sufficient to be deemed extreme and outrageous conduct. Nor are they sufficient to result in the type of severe emotional distress contemplated by this tort.

## VII.   Conclusion

Defendants' Motion for Summary Judgment (Doc. 78) is GRANTED in part and DENIED in part as follows: (1) § 1983 Property Interest – The claim may proceed against Miller in her individual and official capacities. Other Defendants are entitled to qualified immunity. Plaintiff is not entitled to any money damages as a matter of law; (2) § 1983 Liberty Interest – The claim may proceed against Miller in her individual capacity only; and (3) IIED - Miller is entitled to summary judgment.

Plaintiff's Motion for Partial Summary Judgment (Doc. 77) is DENIED. Plaintiff's motion to strike (Doc. 106) is DENIED.

ORDERED this 15th Day of March, 2011.

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**